**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| PLASSEIN INTERNATIONAL | ) Case No. 03-11489 (KG) |
| CORPORATION, *et. al.*, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) |
| WILLIAM BRANDT, as the | ) |
| Trustee of the Estates of Plassein | ) |
| International Corp., *et al.*, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Pro. No. 05-51472(KG) |
| | ) |
| TRIVEST II, INC.; TRIVEST | ) |
| PARTNERS, L.P.; and GULFSTAR | ) |
| GROUP, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) **Related Docket Nos: 131 and 132** |

## MEMORANDUM OPINION [1]

The Court granted defendants' oral motion for judgment on partial findings at the

conclusion of the second day of a scheduled three day trial.  Pursuant to  Bankruptcy Rule

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal
Rule of Bankruptcy Procedure 7052.  To the extent any of the following findings of fact are
determined to be conclusions of law, they are adopted, and shall be construed and deemed,
conclusions of law.  To the extent any of the following conclusions of law are determined to be
findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

7052(c).[2]  The Court made its oral ruling subject to issuance of mandatory findings of fact and conclusions of law,  BR. 7052(c),  which follow.

## BACKGROUND

The dispute giving rise to the Court's ruling is described in greater detail in two previous rulings by the Court on motions to dismiss (Opinion, D.I. 28) and for summary judgment (Opinion, D.I. 94). The following summary is helpful in putting the matter at hand in context.

On June 18, 1999, debtor Plassein International Corporation ("Plassein") was formed under Delaware law to acquire several privately held manufacturers of flexible packaging and specialty film (the "January Target Companies"). Plassein accomplished the acquisitions of the January Target Companies through a series of leveraged buyouts ("LBO") and associated financing.

The LBO transactions proceeded in two phases. In the first phase, on January 10, 2000 (the "January Acquisition"), Plassein closed on acquisitions of the stock of: (a) Plastical Industries, Inc. ("Plastical," n/k/a Plastical International of Spartanburg, Inc.); (b) Nor Baker

---

[2]  Bankruptcy Rule 7052(c) provides that:

> (c) Judgment on Partial Findings.  If a party has been fully heard on an issue during a non-jury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Industries, Ltd. ("Nor Baker," liquidated in Canada); (c) Marshall Plastics Film, Inc. ("Marshall," n/k/a Plastical International of Martin, Inc.); and (d) Key Packaging Industries Corp. ("Key," n/k/a Plastical International of Salem, Inc.). Plassein also purchased the assets of Transamerican Plastic LLC ("Transamerican," n/k/a Plassein International of Ontario, Inc.). In the second phase, on August 15, 2000 (the "Rex Acquisition") (collectively with the January Acquisition, the "Acquisitions"), Plassein acquired the stock of Rex International, Inc. ("Rex," n/k/a Plassein International of Thomasville, Inc.).

Following the conversion of the cases, plaintiff Chapter 7 Trustee (the "Trustee") filed this adversary proceeding on May 11, 2005, against defendants Trivest II, Inc. ("Trivest II") and Trivest Partners, L.P. ("Trivest Partners," collectively, "Trivest"); and GulfStar Group, Inc. ("GulfStar"). The Trustee sought to recover (1) $2 million paid to Trivest II and GulfStar as investment fees in connection with the January Acquisition; (2) $972,000 paid to Trivest Partners as a transaction fee related to the Rex Acquisition; and (3) a total of $1,269,685 paid between the years 2000 and 2003 to Trivest II and Trivest as management fees.

The Trustee based his claims primarily on Delaware constructive and fraudulent conveyance law, alleging that the stock acquisitions rendered Plassein insolvent; that the Debtors did not receive reasonably equivalent value for the fees paid to Trivest and GulfStar; and that the remaining assets of Plassein and associated entities (the "Debtors") were unreasonably small as a result of paying fees to Trivest and GulfStar.

3

## FINDINGS OF FACT[3]

1.    Plassein Film & Packaging Corp. was formed in late 1997. PTO, ¶ 1.

2.    On May 18, 1999, GulfStar and Plassein Film and Packaging Corp. entered into an agreement under which GulfStar was to provide services in the purchase of certain flexible packaging and specialty film manufacturers (the "GulfStar Engagement Letter"). PTO, ¶ 2.

3.    On June 18, 1999, Plassein Film & Packaging Corp. (i.e., Plassein, later renamed "Plassein International Corporation"), was incorporated under the laws of the State of Delaware. PTO, ¶ 3.

4.    George Kent Kahle ("Kahle") was a principal of GulfStar, on or after June 18, 1999, until the close of the January Acquisition. PTO, ¶ 4.

5.    On or after June 18, 1999, until the close of the January Acquisition, Kahle was the Chairman of the Board of Plassein and its sole Director. PTO, ¶ 5.

6.    From June 18, 1999, until the close of the January Acquisition, GulfStar owned approximately 70 percent of the issued shares of Plassein stock. PTO, ¶ 6.

7.    Plassein was organized for the purpose of acquiring the stock of four (4) domestic film packaging manufacturers, i.e., the January Target Companies, along with a

---

[3]  The following defined abbreviations shall apply:

        Pretrial Order (D.I. 114) ("PTO"), Trial Transcript (D.I. 131 and 132) ("Tr. I ___" for the January 12 session and "Tr. II _____" for the January 13 session). Trustee Exhibit ("PX"), Trivest Exhibit ("TX") and GulfStar Exhibit ("GX"). References to the Pretrial Order are limited to and reflect undisputed facts.

certain Canadian corporation, i.e., Nor Baker. PTO, ¶ 7.

8.      GulfStar and Plassein had already negotiated the acquisition agreements with the January Target Companies when they sought Trivest's assistance in locating and obtaining financing to consummate the January Acquisitions. On October 13, 1999, Trivest, Plassein, and GulfStar signed a letter of intent (the "October LOI"). The October LOI was signed by William F. Kaczynski, Jr., on behalf of Trivest, and Kahle, on behalf of Plassein and GulfStar. Under the terms of the October LOI, Trivest agreed to cause affiliated entities to invest at least $15,000,000 in Plassein. Trivest also agreed to (TX 2):

> spend considerable time working with [GulfStar and Plassein, and Trivest's] financing sources to develop an appropriate capital structure that will accomplish the initial purchase transaction and facilitate the growth of Plassein.

Trivest further agreed to provide management capital placement services and support with respect to financial planning, lender negotiations, business strategy, recruiting acquisitions and to assist management in developing and implementing a strategic plan to realize Plassein's objectives. PTO, ¶ 8-10, TX 2.

9.      In connection with those acquisitions, Plassein executed Stock Purchase Agreements, each dated as of January 10, 2000, with the shareholders of each of the January Target Companies (the "Selling Shareholders"). PTO, ¶ 8.

10.     Each Stock Purchase Agreement was executed by Kahle on behalf of Plassein as its Chairman. PTO, ¶ 8.

11.     The acquisition of the stock of the January Target Companies pursuant to the

5

Stock Purchase Agreement, was closed on January 10, 2000, i.e., the January Acquisition. PTO, ¶ 11.

12.     GulfStar received a fee of $1 million in accordance with the terms of the letter, dated May 18, 1999 (the "Engagement Letter") (GX 19).  GulfStar fulfilled its obligations described in the Engagement Letter, and the Trustee did not claim otherwise.  GulfStar did, in fact, arrange and provide start-up funding, financial advisory services, performed due diligence, and numerous other private placement services.  Tr. I, 26, GX 19.

13.     On January 10, 2000, Trivest II and Plassein entered into a management services agreement (the "Management Agreement").  PTO, ¶ 12.  The Management Agreement incorporated and restated the October LOI's provisions regarding management services and fees to be provided to and paid for by Plassein.  Management Agreement, Sections 3 and 6.2.  Section 3 of the Management Agreement sets forth Trivest's duties as a manager, providing that:

> [Trivest II] will render management, consulting and financial services to [Plassein] and it subsidiaries, which services will include advice and assistance concerning all aspects of the operations, planning and financing of [Plassein] and its subsidiaries, as needed from time to time, including advising [Plassein] and it subsidiaries in their relationships with banks and other financial institutions and with accountants, attorneys, financial advisers and other professionals...[Trivest II] will use its best efforts to cause its employees and agents to provide [Plassein] and its subsidiaries with the benefit of their special knowledge, skill and business expertise to the extent relevant to the business and affairs of [Plassein] and it subsidiaries.  In addition, [Trivest II] will render advice and assistance in connection with any acquisition, dispositions or financing

6

> transactions undertaken by [Plassein] and its subsidiaries and
> will from time to time bring to [Plassein] such investment and
> other acquisition opportunities as [Trivest II] deems appropriate
> in its sole discretion.

TX 2.

Under the Management Agreement, Plassein agreed that it would pay Trivest an annual management fee of $300,000. In consideration for this annual fee, Trivest agreed to provide certain management services. (*Id.*) The parties also agreed that the annual management fee could be adjusted if Plassein, or its subsidiaries, acquired any additional business operations. TX 2.

14.     Trivest II and Trivest also entered into an assumption and assignment agreement (the "Assignment Agreement") under which Trivest II assigned any remaining rights and obligations under the Management Agreement to Trivest Partners. PTO, ¶ 13, TX 5.

15.     The January Acquisition was funded by loans (the "Bank Financing") from a group of financial institutions led by Fleet Capital Corporation ("Fleet"), an equity investment by Trivest and GulfStar and a rollover of equity by the Selling Shareholders. PTO, ¶ 14.

16.     Trivest obtained all the financing for Plassein to operate after the January Acquisition. Specifically, Plassein entered into a $53 million loan and security agreement with a syndicate of banks led by Fleet. Trivest secured adequate loans consisting of (a) a $20 million revolving credit facility, (b) $28 million in term loans, and (c) a $5 million capital

expenditure facility.  Trivest also obtained for Plassein equity investments totaling $26.8 million, with $19.6 million of the equity coming through an investment by affiliated funds of Trivest and $800,000 from GulfStar.  Fleet later increased its credit facility to $72.5 million.  Trivest made an additional equity investment of $6.2 million.  Tr. at 70-78, GX 44, TX 7.

17.    From the financing and equity investments, Selling Shareholders were paid $31,020,012.14; $24,623,831.00 was paid to satisfy existing secured indebtedness; and GulfStar was paid – pursuant to the GulfStar Engagement Letter – a fee of $1,000,000 (the "GulfStar Investment Fee") and Trivest II was paid – pursuant to the October LOI and the Management Agreement – a fee of $1,000,000 (the "Trivest Fee").  GulfStar also received reimbursements of $779,973.46.  PTO, ¶ 16, TX 7.

18.    On or about August 12, 1999, Plassein retained Arthur Andersen to prepare an audited balance sheet and related statement of income for the January Target Companies in accordance with generally accepted accounting principals (GAAP).  PTO, ¶ 17.

19.    On or about August 19, 1999, Plassein retained Corporate Valuation Advisors, Inc., to provide an appraisal with respect the machinery and equipment of the January Target Companies.  PTO, ¶ 18.

20.    Corporate Valuation Advisors, Inc. furnished to Plassein a personal property appraisal as of August 15, 1999, determining the value of the personal property of the January Target Companies as of that date.  PTO, ¶ 19.

21.     Arthur Andersen used the valuation in connection with the preparation of the consolidated balance sheets on a GAAP basis for the January Target Companies as of January 1, 2000.  PTO, ¶ 32.

22.     On or about January 10, 2000, Arthur Anderson issued combined financial statements of the January Target Companies as of January 1, 2000, in accordance with GAAP.  PTO, ¶ 21.

23.     Based on the audited financial statements issued as of January 1, 2000, the total aggregate stockholder equity for the January Target Companies was $8,828,883, according to GAAP.  PTO, ¶ 22.

24.     Following the closing on the January Acquisition, Arthur Andersen prepared an adjusted balance sheet of Plassein under GAAP.  PTO, ¶ 23.

25.     Following the closing on the January Acquisition, Trivest became the majority stockholder of Plassein.  Trivest appointed three of the five seats on the Board of Directors and GulfStar appointed one of the five seats on the Board of Directors.  PTO, ¶ 24.

26.     On or about January 10, 2000, Trivest began providing management services to Plassein and its subsidiaries.  Mr. Kaczynski and Earl Powell became members of the board of directors and Mr. Kaczynski became a vice president of Plassein.  Subsequent to the Rex Acquisition, Mr. Vandenberg also joined the board of directors.  Mr. Kaczynski also headed a team of Trivest employees with respect to Trivest's duties as manager.  When Mr. Kaczynski left in July of 2002, Mr. Vandenberg took on his role and duties.  David

Gershman of Trivest became Plassein's general counsel.  Tr. 75.

27.      Trivest and/or its personnel were not compensated separately for being board members, attending board meetings, serving as officers or acting as general counsel.  Trivest only received payment for this work in accordance with the terms of the Management Agreement.  Tr. 75-76.

28.      Trivest performed its obligations under the Management Agreement, including, among other things, investor relations, negotiations with lenders regarding covenants and reporting, operational review and oversight of Plassein and its subsidiaries, meetings with key management, operational plant visits, retaining consultants as necessary, dealing with business issues, reviewing business opportunities for strategic fits, addressing efficiencies related to planned synergies, addressing liquidity issues (present and future) and cash flow. Tr. I 178-193, 196-204.

29.      On May 17, 2000, Mr. Kaczynski, managing director of Trivest, and Robert A. Zielinski, associate of Trivest, sent a letter to Mr. J. Travis Hain, managing director of BA Capital Company, L.P., submitting a "revised" proposal under which Plassein would acquire 100% of the capital stock and warrants of Rex International, Inc. ("Rex").  PTO, ¶ 25.

30.      In connection with the anticipated acquisition of Rex, Trivest caused Ernst & Young to prepare an audited special purpose consolidated balance sheet of Rex as of August 14, 2000, the day preceding the closing of the acquisition on August 15, 2000 (the "Rex Closing").  PTO, ¶ 26.

31.     According to the audited balance sheet prepared in accordance with GAAP, after adjusting for the fair value of the assets, the total stockholders equity of Rex prior to the closing on the Rex Transaction was $4,549,913.  PTO, ¶ 27.

32.     On August 15, 2000, Plassein closed on the acquisition of the stock of Rex (the "Rex Acquisition").  At the Rex Closing, $31,914,374 was paid to the selling shareholders of Rex; $22,378,845 was used to discharge existing indebtedness; and $3,780,387 was used to pay transaction expenses.  PTO, ¶ 28.

33.     In the aggregate, $67,617,171 was disbursed at the Rex Closing, which was funded by an increase in the Fleet term debt of $16,496,253, senior subordinated notes of $25,000,000, and by Trivest through an additional equity investment of $6.2 million, which investment included the conversion to equity of a $5 million note granted to it in the January Acquisition.  PTO, ¶ 29.

34.     For the Rex Acquisition, Trivest negotiated with lenders and equity investors and arranged for the capital described above for Plassein's purchase of Rex.  Trivest also conducted substantial due diligence, which included coordinating financial modeling, conducted substantial due diligence, financial modeling, industry research, synergy research (including potential synergies relating to purchasing power, plant efficiencies, buying of resins, cross-selling, etc.), sensitivity analyses and provided necessary underwriting services. Trivest also assisted Plassein with negotiating the purchase price of Rex.  Tr. I, 205-210.

11

35.    In connection with the Rex Acquisition, Trivest received an investment fee of $972,000 (the "Trivest Partners Fee").  PTO, ¶ 30.

36.    In connection with the Rex Acquisition, Rex became jointly and severally liable with the January Target Companies for the Bank Financing.  Notwithstanding the addition of Rex as a borrower, the Fleet decreased Plassein's Revolving Line of Credit by $1,373,000 to reflect adjustments in the loan covenants after the covenant defaults by the January Target Companies earlier in 2000.  PTO, ¶ 31.

37.    Following the Rex Closing, Ernst & Young prepared an adjusted balance sheet under GAAP to give effect to the transaction.  PTO, ¶ 32.

38.    Ernst & Young adjusted the balance sheet, increasing it by $27,724,217 in goodwill to account for the excess of the purchase price over fair value of the assets as reflected on the consolidated balance sheet of August 14, 2000, plus the cost of the transaction.  PTO, ¶ 33.

39.    For the year ending December 31, 2000, the combined companies had a net operating loss of $1,852,297, which increased by year ending December 31, 2001 to $8,137,169.  PTO, ¶ 34.

40.    The Rex Transaction was fully funded by financing obtained through various financial institutions, all which were secured by the assets of both Rex and the January Target Companies.  PTO, ¶ 35.

12

41.     On August 15, 2000, Plassein and Trivest Partners entered into a supplement to the Management Agreement (the "Supplemental Agreement").  PTO, 36, TX 10.

42.     Pursuant to the terms of the Supplemental Agreement, Plassein's base annual fee (i.e., the Management Fee) to Trivest II increased from $300,000 to $400,000.  PTO, ¶ 37, 38.

43.     For the year 2000, Plassein paid to Trivest $331,169 as a Management Fee. PTO, ¶ 40.

44.     For the year 2001, Plassein paid Trivest $414,800 as a Management Fee.  PTO, ¶ 41.

45.     For the year 2002, Plassein paid Trivest $247,048 as a Management Fee.  PTO, ¶ 42.

46.     Subsequent to the closing on the Transactions, the January Target Companies and Rex continued to maintain independent management, whose duties were to manage the overall operations and integration of the January Target Companies and Rex.  PTO, ¶ 45.

47.     Trivest and GulfStar retained James Cassel, head of investment banking for Ladenburg, Thalman & Co., Inc. in connection with this adversary proceeding to review the fees paid by Plassein to GulfStar, Trivest II and Trivest Partners and render his opinion on whether the fees paid were reasonable.  Mr. Cassel is vice chairman and the head of investment banking with extensive transactional and corporate and transactional financing, including mezzanine and conventional financing; and public offerings and private

placements. Tr. II, 120-124.

48.    Mr. Cassel reviewed the facts of this case, interviewed witnesses from this case and surveyed other equity industry participants.  Mr. Cassel testified that in his expert opinion to a reasonable degree of certainty, based upon the information considered and his professional experience and background: Tr. II, 127-135.

>    (a)    the Trivest II Fee paid by Plassein was in the range of usual and customary fees payable in a purchase/recapitalization transaction;

>    (b)    the GulfStar Investment Fee paid by Plassein was in the range of usual and customary fees payable in a purchase/recapitalization transaction;

>    (c)    the Trivest Fee paid by Plassein was in the range of usual and customary fees payable in a purchase/recapitalization transaction; and

>    (d)    the Management Fees paid to Trivest were in the range of usual and customary fees payable by a portfolio company like Plassein.

49.    The Trustee did not produce an expert witness to opine on the reasonableness of the Trivest Fee, the GulfStar Investment Fee or the Management Fees were reasonable. The Trustee did not provide any evidence - by way of a witness or otherwise - on whether these fees were reasonable or whether Plassein received less than reasonably equivalent value in return for payment of the fees.

50.   In summary, the transfers the Trustee seeks to recover are:

A.   Trivest

| | | | |
|---|---|---|---|
| 1. | January Acquisition Fee | | $1,000,000 |
| 2. | Rex Acquisition Fee | | $  972,000 |
| 3. | Management Fees | | |
| | a. | 2000 | $  331,169 |
| | b. | 2001 | $  414,800 |
| | c. | 2002 | $  247,048 |

B.   GulfStar

January Acquisition
($1 million fees and expenses)              $1,779,973

## CONCLUSIONS OF LAW

## DEBTORS RECEIVED REASONABLY
## EQUIVALENT VALUE FOR THE TRANSFERS

A.      Under Delaware law, a transfer is constructively fraudulent if the plaintiff can

show, by a preponderance of the evidence, that the debtor made the transfers without

receiving reasonably equivalent value of exchange for the transfer. *See Litig. Trust of MDIP*

*Inc. v. De La Rue Cash Sys., Inc. (In re MDIP Inc.)*, 332 B.R. 129 (Bankr. D. Del. 2005).

In addition, the plaintiff must also prove that at the time of the transfer, the debtor either: (a)

was insolvent or became insolvent as a result of the transfer; (b) was engaged or about to

engage in a business or transaction for which its remaining assets were unreasonably small

in relation to the business or transaction; or (c) intended to incur, or believed or reasonably

should have believed that it would incur debts beyond its ability to pay as they came due. *See*

6 Del. Code Ann §§ 1304(a)(2) and 1305(a); *In re MDIP Inc.*, 332 B.R. at 132; *see also*

15

*China Resource Prods. (U.S.A.) v. Fayda Int'l, Inc.*, 856 F. Supp. 856, 863 (D. Del. 1994)

*Liquidation Trust of Hechinger Inc. Co. Of Del. v. Fleet Retail Fin. Group (In re Hechinger Inc. Co. of Del.)*, 327 B.R. 537, 552 (D. Del. 2005).

B.     In determining whether a debtor received reasonably equivalent value, a court must first determine if the Debtor received any value.  Then, the Court must determine whether the value received is reasonably equivalent to the value transferred.  *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (a party receives reasonably equivalent value for what it gives up if it gets "roughly the value it gave"); *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3d Cir. 1996); *In re MDIP Inc.*, 332 B.R. at 133.

C.     The applicable statute does not define "reasonably equivalent."  However, courts define the scope and meaning of the term under the totality of the circumstances.  *Id.* at 153.  In doing so, courts have generally considered three factors: (1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid.  *Id.*  Importantly, the statute and case law require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction which the plaintiff seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under law.  *See* 6 Del. Code Ann. § 1305; *see also In re Churchill Mortgage Inv. Corp.*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000) (analysis is as to the particular transaction at

16

issue without regard to the nature of the debtors' overall enterprise); *Solow v. Reinhardt (In re First Commercial Mgmt. Group, Inc.*), 279 B.R. 230 (Bankr. N.D. Ill. 2002) (accord).

D.     In this case, the Court must evaluate three transfers which the Trustee challenges in determining whether Plassein received reasonably equivalent value in return for what it gave up.  The transactions are Plassein's payment of (i) the Trivest Fees; (ii) the GulfStar Investment Fee; and (iii) the Management Fees.  The undisputed facts demonstrate that Plassein did receive reasonably equivalent value in exchange for the payments.

### Trivest II January Acquisition Fee

E.     On January 10, 2000, Trivest II received a payment of $1,000,000 as fee for the January Acquisition.  Plassein and Trivest agreed that the Trivest Fee would be paid if Trivest raised the capital which would allow Plassein to purchase the January Target Companies and have subsequent operating capital.  The documents setting forth the specific terms of this agreement are the October LOI and the Management Agreement.  Trivest and Plassein agreed to the October LOI and the Management Agreement in good faith and at arm's length.

F.     Trivest raised the capital and, on January 10, 2000, Plassein acquired the Founding Companies.  Trivest's efforts led (i) Fleet to lend, in various forms, $53 million; (ii) Trivest related funds to make a $19.6 million equity investment; and (iii) GulfStar to make an $800,000 equity investment.  There was also an additional $7 million in rollover equity.  Trivest performed its obligations under the relevant agreements.  In return for raising

17

approximately $79.8 million in capital so that Plassein could purchase the Target Companies and fund further operations, Plassein had the Trivest Fee paid at closing.  The amount of the Trivest Fee (less than 1.3 % of the capital raised) is reasonable under the circumstances - i.e., in the "range of usual and customary fees payable in a purchase/recapitalization transaction."

### Trivest Partners Rex Acquisition Fee

G.      On August 15, 2000, Trivest Partners received a placement payment of $972,000, the Trivest Partners Fee.  Plassein and Trivest agreed that the Trivest Partners Fee would be paid if Trivest assisted Plassein in an acquisition of another business operation. The documents setting forth the specific terms of this agreement are the October LOI and the Management Agreement.   Trivest and Plassein agreed to the October LOI and the Management Agreement in good faith and at arm's length.

H.      Trivest assisted Plassein by providing services and raising capital, and, on August 15, 2000, Plassein acquired Rex.  Trivest's work resulted in (i) Fleet reaffirming the original loan and increasing its commitment; (ii) Trivest related funds making an additional $6.2 million equity investment; and (iii)  certain lenders lending $39 million in subordinated debt.  Trivest performed its obligations under the relevant agreements and by paying the Trivest Partners Fee, Plassein performed its obligations under the relevant agreements. Plassein thereby obtained $65 million in new capital with which to purchase Rex, and Plassein had the Trivest Partners Fee paid to Trivest Partners at closing.  The amount of the Trivest Partners Fee is reasonable under the circumstances - i.e., in the "range of usual and

customary fees payable in a purchase/recapitalization transaction."

I. Plassein received reasonably equivalent value in return for the payment of the Trivest Partners Fee.

### The Management Fees

J. Between March 24, 2000 and July 1, 2002, Trivest Partners received regular payments as the Management Fees. (Def. Ex. 6). Plassein and Trivest agreed that Trivest Partners would be paid the Management Fees if Trivest Partners provided certain management services for Plassein.  The documents setting forth the specific terms of this agreement are the October LOI and the Management Agreement.  (Def. Ex. 1 at 2, Investment Term Sheet, Def. Ex. 2 at §§ 3, 6.3) Trivest and Plassein agreed to the October LOI and the Management Agreement in good faith and at arm's length.  (Vandenberg Dec. at ¶¶ 7-11)

K. Beginning on January 10, 2000, Trivest provided management services to Plassein including, among other things, investor relations, capital raising, system integration, financial reporting improvements, weekly cash reports, management replacement, 13 -week cash flows, negotiations with lenders regarding covenants and reporting, operational review and oversight of Plassein and its subsidiaries, meetings with key management, operational plant visits, retaining consultants as necessary, dealing with business issues, reviewing business opportunities for strategic fits, addressing efficiencies related to planned synergies, addressing liquidity issues (present and future) and cash flow.  These services provided true,

19

recognizable value to Plassein.  For instance, the Gibson Project undertaken by Trivest alone provided Plassein with a benefit of $2 million in cost savings on resin pricing.

L.     Trivest performed its obligations under the relevant agreements and, when Plassein paid the Management Fees, Plassein performed its obligations under the relevant agreements.  The amount of the Management Fees is reasonable under the circumstances - i.e., in the "in the range of usual and customary fees payable by a portfolio company such as Plassein."

M.     Plassein received reasonably equivalent value in return for the payment of Management Fees.

### GulfStar Fees

N.     GulfStar fulfilled its obligations under the Engagement Letter by arranging and providing start-up funding for Plassein, providing financial advisory services, overseeing the private placement of equity and debt in the January Acquisition and providing additional funding for capital expenditures and additional acquisitions.

O.     GulfStar also prepared the Confidential Information Memorandum to attract potential lender and private equity funds.

P.     In return, GulfStar received $1 million upon the closing of the January Acquisition.  This sum was less than GulfStar was entitled to receive under the Engagement Letter.

20

Q.    The trial testimony established that the GulfStar Fee was in the range of usual and customary fees payable in a transaction such as the January Acquisition.

R.    GulfStar also received reimbursement of its expenses.  The $779,973 amount was appropriate.

S.    The relationship between Trivest and GulfStar is arm's length.  There are no connections between the two entities.  Their boards of directors do not overlap and there is no common equity ownership.

## CONCLUSION

The Court has concluded on the bases of the facts and law that the defendants are not liable for fraudulent transfers.  The evidence in support of the findings of fact is substantial. The Target Companies received significantly equivalent value.  The evidence is wholly consistent with the practical reality of the circumstances that the fees paid to Trivest Partners and GulfStar pale in comparison to their losses.  Trivest invested more than $25 million in Plassein; GulfStar invested its resources and millions of dollars; Fleet loaned in excess of $53 million; investors purchased $39 million in subordinated debt.  Accordingly, the Court will enter judgment in favor of defendants.

Dated: May 11, 2009

KEVIN GROSS, U.S.B.J.

21

## APPENDIX - MOTIONS IN *LIMINE*

The Court ruled on motions in *limine* which the Court granted on the record. They are briefly described as follows:

1.     Houlihan Lokey Valuation Reports.

a.     The defendants intended to introduce at trial valuation reports ("Valuation Reports") of Plassein which Houlihan Lokey Howard & Zukin ("Houlihan Lokey") prepared for Fleet. The reports were prepared (1) in or about April, 2001 for Debtors' enterprise value as of February 28, 2001; and (2) in or about April, 2002 for Debtors' enterprise value as of December 31, 2001. The Court excluded the Valuation Reports because Plassein did not call a witness from Fleet or Houlihan Lokey to authenticate the Valuation Reports.

A document can be authenticated by lay or expert testimony. Where a lay person testifies as to the authenticity of a document, the lay person must have personal knowledge that the document is what it purports to be. Fed. R. Evid. 602 and 701.

Whether the proponent has met its burden in authenticating evidence is preliminarily a matter for the court to decide. Fed. R. Evid. 104(a). The party moving for admission of the Valuation Reports failed to present a witness, lay or expert, who could properly authenticate the Records. Since the Valuation Reports were not authenticated, they could not be admitted into evidence.

  b.  Evidence is admissible so long as it is relevant. Fed. R. Evid. 401. Evidence that is not relevant is not admissible. Fed. R. Evid. 402. Evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401.

  Relevancy is not an inherent characteristic of any item of evidence but exists only in relation between an item of evidence and a matter properly provable in the case. In the case at bar, the reports were submitted to prove the adequacy of the Debtors' capital at the time of the alleged fraudulent transfers. The reports were not contemporaneous with the transfers at issue. Consequently, the reports had little relation to the probability that Debtors' capital was adequate or reasonable at the time of the transfers. The Reports were therefore inadmissible as they were not relevant.

  2.  <u>Use of Deposition Transcripts</u>

  The Trustee designated deposition testimony of persons who Plassein was calling as witnesses at trial, not for impeachment but in support of his case. The Trustee argued that although the witnesses were available at trial, F.R.Civ.P. 32 permits a party's use of the deposition of a party or officer, director, managing agent or designee for any purpose. The Court disagreed and sustained the objection.

Under Fed. R. Civ. P. 32, deposition testimony will generally not be admitted for its substance unless the deponent is unavailable.  This is based on the theory that deposition testimony is an inferior mode of eliciting testimony.

Here, the witnesses were available in court and in the exercise of discretion the Court preferred live testimony, with the witnesses' deposition testimony available for impeachment.